## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ADAM FLETCHER YOUNG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-06-146-D** |
| | ) | |
| **GARFIELD COUNTY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, a state prisoner appearing pro se, brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights. United States District Judge Ralph G. Thompson referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).[1] Defendant Garfield County has filed a motion for summary judgment, as has Defendant Garfield County Detention Center, and Defendants Coleman, Taylor, Gabriel, Dickson, Stokes, and Winchester, to which Plaintiff has responded.[2] Thus, the motions are now at issue. For the following reasons, it is recommended that the motions be granted in part.

---

[1] The action has since been reassigned to United States District Judge Timothy D. DeGiusti.

[2] Defendants' motions to strike Plaintiff's responses are denied because Plaintiff has shown he is entitled to the protection of the prison mailbox rule. Plaintiff's responses to Defendants' motions to strike contain material demonstrating that the James Crabtree Correctional Center does not have a legal mail system adequate to satisfy the requirements of the prison mailbox rule, and Plaintiff has attested and shown that he timely delivered his responses to prison officials, postage prepaid. See Price v. Philpot, 420 F.3d 1158, 1165 (10th Cir. 2005). See Plaintiff's Declaration under Penalty of Perjury attached to his Response [Doc. No. 128] and his Inmate's Request for Disbursement of Legal Costs, attached to his Sur-reply [Doc. No. 132]. Thus, using the date Plaintiff delivered his responses to prison officials for mailing, December 31, 2007, they are timely.

By this action, Plaintiff sues the Board of Commissioners of the County of Garfield (hereinafter "Garfield County");[3] the Garfield County Detention Center Authority ("GCDC"); Bill Winchester, the Sheriff of Garfield County; Misty Taylor, Jail Administrator; Randy Coleman, Deputy Jail Administrator; and Tracy Dickson, Tony Stokes, and Sheila Gabriel, jailers at the GCDC, for acts and omissions that occurred while he was a pretrial detainee.  Amended Complaint, pp. 1-1a.

In a four-count complaint, Plaintiff sets forth several constitutional claims. Specifically, in Count I, Plaintiff asserts a failure to protect claim against Garfield County, the GCDC, Sheriff Winchester, and Defendants Taylor, Dickson, and Gabriel.  In support, Plaintiff contends that on June 24, 2005, he complained to the Oklahoma Department of Special Health - Jail Inspection Division that he was being given inadequate quantities of food at the GCDC.  Plaintiff also contends he "filed a criminal complaint" against Defendant Taylor, complaining of inadequate food servings, and filed a grievance about the situation with Sheriff Winchester.  Amended Complaint, p. 3a.  Approximately one month later, on July 30, 2005, Plaintiff filed a grievance complaining about jail staff providing another inmate ("Inmate X")[4] with the home addresses of Plaintiff's friends and relatives.  Id.

---

[3] By order dated March 13, 2007, Plaintiff amended his complaint to sue Garfield County by its correct name, the Board of Commissioners of the County of Garfield, and to sue the Garfield County Detention Center by its proper name, the Garfield County Detention Center Authority.  See Doc. No. 61.  For this reason, Garfield County's summary judgment argument set forth in Proposition I lacks merit.

[4] Plaintiff does not give the name of this inmate anywhere in the complaint.

According to Plaintiff, on August 7, 2005, Defendant Dickson was working the control tower overseeing the area in which Plaintiff was housed, and opened the door to Plaintiff's cell to enable Inmate X to assault Plaintiff inside his cell.  Amended Complaint, p. 3a.  Plaintiff contends that Inmate X beat and kicked him, and that as a result of the attack, he lost all vision in his right eye.  Id.  After the assault, Plaintiff contends Defendant Dickson came to his cell with "some jail trustees," and brought him a mop and bucket and instructed him to clean up the blood in his cell.  Id.  Shortly after this attack, according to Plaintiff, Defendant Dickson ceased working for the GCDC, and Defendant Dickson's supervisor, Defendant Gabriel, was demoted.  Id. at 3b.  He further contends that approximately two weeks after the attack, Inmate X confessed to it, but that jail officials allowed Inmate X and Plaintiff to reside in the same pod for more than six weeks.  Id.  As a result of these acts and omissions, Plaintiff brings failure to protect claims against Sheriff Winchester, Defendant Taylor, Garfield County, and the GCDC, and also alleges these defendants failed to train Defendant Dickson properly.  Id.  He also complains Defendant Gabriel failed to protect him and failed to supervise her staff on the night of the attack.  Id.

In Count II, Plaintiff brings another set of failure to protect claims against Garfield County, the GCDC, Sheriff Winchester, and Defendants Taylor, Coleman, and Stokes based upon a second assault that occurred while he was housed at the GCDC.  In his supporting factual allegations, Plaintiff contends that on August 19, 2005, Defendant Coleman was escorting Plaintiff back to his cell when they arrived at a large open day room.  Amended Complaint, p. 3c.  Plaintiff alleges Defendant Coleman noticed that Inmate X, along with

3

other inmates, was standing in the room and abandoned him in the room without unlocking his cell.  Id.  Thus, according to Plaintiff, Inmate X was able to attack Plaintiff again.  Id. Plaintiff asserts that after Defendant Coleman left, Inmate X approached him and began screaming at him and hitting him.  Id.  Further, Plaintiff alleges Defendant Stokes was working in the control tower that oversaw the room  where Plaintiff was attacked by Inmate X, witnessed the attack, and could have, but did not, open Plaintiff's cell door from his post to enable Plaintiff to escape the attack.  Id.  Based upon these allegations, Plaintiff contends Garfield County, the GCDC, Sheriff Winchester, and Defendant Taylor failed to act to protect him after learning about Inmate X's previous attack upon Plaintiff via a grievance he filed two days after the first assault.  He also contends these Defendants failed to train Defendant Stokes properly.  Id.

In Count III, Plaintiff alleges Garfield County, the GCDC, Sheriff Winchester, and Defendants Taylor and Coleman, hindered his access to the courts by withholding resources he needed to bring the claims contained in Counts I and II.  Amended Complaint, p. 4a. Specifically, he contends he had no access to a law library to prepare the complaint filed in this action, that prison officials interfered with his attempt to purchase his own copy of a prisoners' litigation manual, and refused to allow him to have a pen to complete his pleadings.  Id.  Additionally, Plaintiff contends these Defendants were deliberately indifferent to difficulties Plaintiff encountered with his attempt to have his court-appointed attorney replaced with different counsel.  Id. at 4a-4b.  Plaintiff also complains that Defendants deliberately failed to return certain grievance forms to him in order to "thwart"

his ability to demonstrate exhaustion of administrative remedies.  Id. at 4b.  He complains Defendants have a "widespread, established policy of hindrance" and were aware of his lack of adequate materials and each other's refusal to provide him with resources necessary to file the complaint.  Id.

Finally, in Count IV, Plaintiff brings claims against Garfield County, the GCDC, Sheriff Winchester, and Defendants Taylor and Coleman "for stealing and sharing with [] law enforcement, as well as refusing to deliver to me, my proper[l]y-marked, privileged incoming U.S. Mail . . . ."  Amended Complaint, p. 4c.  In particular, Plaintiff maintains that on December 6, 2005, a jail staff member opened an envelope marked legal mail, outside of Plaintiff's presence and in violation of jail policy, and Defendant Coleman directed the jail staff member not to deliver the envelope to Plaintiff.  Id. at 4c-4d.  According to Plaintiff, Defendant Coleman took Plaintiff's legal mail to the courthouse and showed it to law enforcement officers.  Id. at 4d-4e.  Plaintiff claims he never received the legal mail in the envelope.  Id. at 4e.  Plaintiff further complains that on December 20, 2005, he was given another piece of his legal mail that had been opened outside his presence and held for at least three days.  Id.  Similarly, Plaintiff complains that Defendant Coleman confiscated four letters in January 2006, one of which was legal mail and another that was "privileged" mail, and opened them outside Plaintiff's presence.  Id.  Plaintiff states he submitted three separate grievances alerting Defendants to the "'legal mail' tampering and theft," but that none did anything to stop it.  Id. at 4f.

In its motion, Garfield County seeks summary judgment based upon an argument that it, as named, is not a proper party to Plaintiff's suit; that Plaintiff has failed to present evidence of an unconstitutional policy; and that Plaintiff cannot recover punitive damages against it.   Garfield County Motion, pp. 5-6, 14. Similarly, the GCDC seeks summary judgment by arguing that Plaintiff has failed to present evidence of an unconstitutional policy and that Plaintiff cannot recover punitive damages against it.   GCDC Motion, pp. 6, 12. Sheriff Winchester and Defendants Coleman, Taylor, Gabriel, Dickson, and Stokes advance several arguments in support of their motion for summary judgment.   They contend they are entitled to summary judgment on Plaintiff's failure to protect claims based upon qualified immunity, on his denial of access to the courts claims because Plaintiff suffered no actual injury, and on his mail claim because they were justified in subjecting Plaintiff's legal mail to greater scrutiny than that provided by the GCDC's policy.   Motion, pp. 14, 21-22.

## I.   STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings and evidentiary materials "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   "Material facts" are "facts that might affect the outcome of the suit under the governing law."   Id.  In considering a motion for summary judgment, the court views the evidence and the inferences drawn from the record in the light

most favorable to the nonmoving party.  Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000).

To obtain summary judgment, the moving party need not affirmatively negate the nonmovant's claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Instead, the moving party initially bears the burden only of "showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 325 (internal quotations omitted).  Once the moving party has satisfied this burden, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. Id. at 324.  The  nonmoving party "may not rest upon mere allegation" in his pleadings to satisfy this requirement.  Anderson, 477 U.S. at 256.  Rather, the nonmoving party must "go beyond the pleadings and by . . . affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324 (internal quotations omitted).

## II.    FACTS

The following material facts recited herein are derived from the summary judgment evidence submitted by the parties in the motions and responses.  All material facts listed in Defendants' statements of material facts that Plaintiff failed to specifically controvert have been deemed admitted.  See LCvR 56.1(c).  Additionally, the amended complaint has been treated as an affidavit, to the extent its allegations are based upon facts within Plaintiff's personal knowledge, because it is accompanied by a sworn statement made under penalty of perjury.  See Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).

A.      **Facts Relevant to Failure to Protect Claims**

From January 26, 2005, through August 3, 2006, Plaintiff was in the custody of Garfield County.  Motion, p. 2, Ex. 1;[5] Response, p. 4.  On June 22, 2005, Plaintiff was charged with attempting to escape from a county jail, and eventually convicted upon his plea of no contest.  Motion, Ex. 6.

On July 30, 2005, Plaintiff submitted a grievance addressed to Defendant Taylor and Sheriff Winchester wherein he reported that another inmate, Enrique Sevilla (also known as "Sleepy" and identified as Inmate X earlier), demonstrated to Plaintiff that he was in possession of the home addresses of Plaintiff's ex-wife, daughters, parents, two friends, and cousin, and had offered to sell the addresses back to him.  Motion, p. 7, Ex. 8; Response, Doc. 82.  Plaintiff indicated his belief that Sevilla revealed this information to him "to show his power over the guards [and] how he can get things done - and also as a veiled threat to me not to discuss this with anyone."  Response, Doc. 82.  Plaintiff asked Defendant Taylor and Sheriff Winchester "to prevent [Sevilla] from acquiring my famil[y's] addresses and prevent him from following through on his threats to me and my family."  Motion, Ex. 8; Response, Doc. 82.  Plaintiff contends that a day or two after he submitted the grievance, he and Defendant Taylor discussed it; during their conversation, Plaintiff expressed concern about paying Sevilla for the addresses because he suspected Sevilla may have written down

_____

[5] The Defendants' statement of facts is contained in the motion filed by Defendants Coleman, Taylor, Gabriel, Dickson, Stokes, and Winchester ("Motion").

the addresses and would "try to sell them to me again or . . . continue to threaten me or whatever." Motion, p. 7, Ex. 1, pp. 62-63; Response, p. 7.

On August 7, 2005, Kim Johnson, a nurse at the GCDC, noticed abrasions on Plaintiff's face, and she asked him how they got there. Plaintiff told her he had been attacked. Motion, p. 7; Response, p 7. Nurse Johnson took Plaintiff into a private examination room, along with Jailer Nic Botts, so she could evaluate his injuries and obtain more information about what occurred. Plaintiff told Nurse Johnson that he had been attacked by another inmate while he was sleeping in his cell and relayed his belief that jail staff were involved in the attack because the inmates were locked down at the time of the attack such that a staff member would have had to allow the attacker into Plaintiff's cell. Motion, p. 8; Response, p. 7. Botts encouraged Plaintiff to identify his attacker and left Plaintiff alone with Nurse Johnson in the hope that Plaintiff would be willing to tell her who attacked him, but Plaintiff refused to do so. Motion, p. 8; Response, p. 8.

On August 9, 2005, Plaintiff filed a grievance addressed to Sheriff Winchester and Defendant Taylor complaining about the attack. Motion, p. 9, Ex. 10, Response, p. 10, Doc. 12. In that grievance Plaintiff reported that while he was asleep, his electric door was opened and two inmates entered his cell. Id. He stated that one beat him badly in the head and face, and that after the attack Defendant Dickson, and possibly Defendant Gabriel, had the trustees bring him a mop and bucket and forced him to clean up the blood in his cell. Id. Plaintiff also relayed his belief that Defendant Dickson was working in the control tower at the time of the attack and was responsible for opening his cell door. Id. Plaintiff did not identify his

9

attackers in this grievance.  In the portion of the grievance provided for the inmate to identify the action that should be taken to resolve the problem, he asked for monetary compensation and for Defendant Dickson to be fired.  Id.

On August 16, 2005, Sevilla informed Defendant Taylor that he had attacked Plaintiff on August 7.  Motion, p. 10, Ex. 11; Response, pp. 11, 25.  According to an affidavit submitted by Defendant Taylor, Sevilla stated that Plaintiff had come into his cell and would not leave, so Sevilla "smacked him" several times.  Motion, Ex. 11.  Sevilla also provided Defendant Taylor with copies of notes he and Plaintiff had written back and forth wherein they discussed payment and other details related to Sevilla's efforts in helping Plaintiff arrange and carry out an escape attempt.  Id.  In one note, Plaintiff, referring to the August 7 attack, wrote: "You have (& have had) my word that I have in no way put your name, hinted at you or your name, or made any insinuation whatsoever that you had anything to do with any events of last Sunday evening.  Furthermore, I have no grudge at all against you . . . If you'd broken my nose or knocked out a tooth - that would be different."  Id. (alteration omitted).

On August 20, 2005, Plaintiff submitted another grievance to Sheriff Winchester and Defendant Taylor stating that he had been attacked again.  Motion, Ex. 12; Response, Doc. 40.  He reported that Defendant Coleman had been escorting him back to his cell through the day room where several other inmates were gathered.  Id.  In his grievance Plaintiff complained that "even though I was not supposed to be out with the other inmates [Defendant Coleman] just left me in the big [d]ay room and left!"  Id.  According to Plaintiff,

10

after Defendant Coleman left, another inmate began walking towards Plaintiff and began to hit him in the face and head.  Id.  Plaintiff further stated that Defendant Stokes was working in the control tower at the time of the attack and refused to unlock his cell door to enable him to escape the attack, and  "did nothing" while the attack took place.  Id.  Plaintiff did not identify his attacker in this grievance.  Motion, p. 11, Ex. 12; Response, pp. 11-12, Doc. 40. In the portion of the grievance provided for the inmate to identify the action that should be taken to resolve the problem, Plaintiff requested monetary compensation, suggested he should be given punitive damages, and asked that Defendants Coleman and Stokes be fired. Response, Doc. 40.

### B.      Facts Relevant to Right of Access to the Courts Claims

#### 1.      Denial of Resources

The GCDC does not have a law library available for inmates to use.  Consequently, Plaintiff requested legal materials, including copies of statutes and a prisoner self-help litigation manual, by submitting requests to staff and grievances to Sheriff Winchester and/or Defendant Taylor.  Plaintiff also asked for an ink pen to enable him to complete court documents.  All of his requests were refused.  Amended Complaint, pp. 4a, Docs. 13-14, 30-31, 47-48, 63, 116.  Plaintiff contends he needed these materials to assist him with the preparation of the claims brought in this suit.  Id. at 4a.

#### 2.      Interference With Mail

The GCDC Inmate Handbook contains the GCDC's policy regarding inmate mail. It provides in relevant part: "All incoming mail, with the exception of mail that is properly

marked 'Legal Mail' . . . will be opened and inspected for contraband prior to delivery. Legal and Privileged [mail] may be opened and inspected for contraband in the inmate's presence." Amended Complaint, Doc. 96; Response, Doc. 96. The Handbook defines "Legal Mail" as "correspondence sent to or from the Oklahoma Attorney General, courts or attorneys," and specifically excludes "[m]ail to or from an attorney's assistant or legal aid assistant" from treatment as legal mail. Id. Further, the handbook defines "Privileged Mail" as "correspondence to or received from all elected Federal, State Officials, Embassy and Consulates, Department of Justice and agencies with the Oklahoma Department of Safety and Corrections. Id.

On December 6, 2005, GCDC staff member Shirley Dills was reviewing inmate mail and opened an envelope addressed to Plaintiff from "CESB Legal Research and Document Processing" with a return address for a post office box in Brenham, Texas. Motion, pp. 11-12, Ex. 13; Response, pp. 12-13. GCDC officials learned that the Brenham post office box, at least at one time, belonged to Plaintiff. Motion, pp. 11-12, Ex. 13; Response, pp. 12-13. CESB Legal Research and Document Processing consists of Plaintiff's non-attorney family members (Catherine, Elizabeth, Sylvia, and Brian), who assisted Plaintiff by making photocopies of letters Plaintiff drafted to Tim Beebe, the attorney representing him in criminal proceedings before the District Court of Garfield County, and sending the copies to Plaintiff via the mail. Motion, Ex. 1, pp. 95-99; Response, p. 14. Plaintiff's family, through CESB, also assisted him with the preparation of the complaint filed in this action. Motion, p. 12, Ex. 1, pp. 95-96.

From the materials submitted by the parties, it is not entirely clear what the envelope Dills opened contained.  Defendants assert, and Plaintiff denies, the envelope contained contraband, including a ballpoint pen refill, yellow sticky notes, and a map to Northern Tennessee and Georgia.  Motion, p. 11, Ex. 13; Response, pp. 12-13.  However, the parties appear to agree that the envelope did contain copies of two letters Plaintiff wrote to Tim Beebe regarding his pending criminal case.  Response, Ex. A-12, p. 5; Amended Complaint, Docs. 105-106, 113. Plaintiff filed grievances complaining about this incident, which were addressed to Sheriff Winchester and Defendant Taylor, on December 6, 2005, and December 8, 2005, and a Request to Staff addressed to Sheriff Winchester or Defendant Taylor on December 16, 2005.  Amended Complaint, Docs. 32, 72, 94.

Additionally, in his verified amended complaint Plaintiff contends that on December 20, 2005, he was given an envelope from CESB that stated it "contains CONFIDENTIAL LEGAL CORRESPONDENCE sent from addressee to Oklahoma Attorney Tim Beebe." Amended Complaint, p. 4e, Doc. 11.  The envelope was postmarked December 12, 2005, and, according to Plaintiff, contained legal mail and had been opened, outside his presence, and resealed with tape before it was delivered to him.  Id.  Defendant Coleman admits that this envelope was opened outside Plaintiff's presence.  Response, Ex. A-12, p. 5. On December 18, 2005, Plaintiff submitted a Request to Staff to Defendant Taylor "or" Sheriff Winchester complaining that Defendant Coleman had confiscated his legal mail.  Amended Complaint, Doc. 95.

In his verified complaint, Plaintiff describes a third incident during which Defendant Coleman allegedly seized four pieces of his mail.  According to Plaintiff, one piece of the seized mail contained correspondence from Plaintiff to his attorney and was marked as legal mail.  Amended Complaint, p. 4e, Docs. 23-24, 26, 29, 43, 45, 61, 89.  Another piece of the seized mail was sent to him in an envelope showing the National Transportation Safety Board ("NTSB") Administrative Law Judges to be the sender.  Amended Complaint, p. 4e, Doc. 27.  Plaintiff contends these letters were opened, outside his presence, before they were delivered to him approximately 36 hours after Defendant Coleman confiscated them.  Amended Complaint, p. 4e.  Defendant Coleman admits that he instructed jail staff to open these documents outside Plaintiff's presence.  Response, Ex. A-12, p. 5.  Plaintiff submitted a grievance to Defendant Taylor/Sheriff Winchester complaining that Defendant Coleman had intercepted some of his mail.  Amended Complaint, p. 4f, Doc. 66.

## III.   SUMMARY JUDGMENT ARGUMENTS

### A.   Failure to Protect Claims

Defendants contend they are entitled to qualified immunity for the attacks about which Plaintiff complains in Counts I and II of the amended complaint.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation" if the complained of behavior did not violate clearly established law.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Once a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to show both that (1) the defendant violated a constitutional or statutory right and (2) the constitutional or statutory

right was clearly established when the alleged violation occurred. Verdecia v. Adams, 327 F.3d 1171, 1174 (10th Cir. 2003) (applying test in context of summary judgment motion). "The threshold inquiry is whether the alleged facts (or, on summary judgment, the evidenced facts) taken in the light most favorable to the plaintiff show a constitutional violation." Simkins v. Bruce, 406 F.3d 1239, 1241 (10th Cir. 2005); accord Saucier v. Katz, 533 U.S. 194, 201 (2001).[6] If so, the Court must then ask "whether the right was clearly established." Saucier, 533 U.S. at 201.  If Plaintiff fails to satisfy either portion of the two-pronged test, the Court must grant the defendants qualified immunity.  Gross v. Pirtle, 245 F.3d 1151, 1156 (10th Cir. 2001).

The Eighth Amendment[7] protects prisoners against cruel and unusual punishment, which has been interpreted to impose a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates."  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  In particular, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners."  Id. at 833 (quotation altered and omitted).  A prison official's failure to carry out this duty rises to the level of a constitutional violation  when two conditions are met:

---

[6] The Supreme Court recently has granted certiorari and requested arguments addressing whether Saucier should be overruled.  Pearson v. Callahan, 128 S.Ct. 1702 (March 24, 2008).

[7] Because Plaintiff was a pretrial detainee at the time of the events made the basis of this suit, his claims are technically brought pursuant to the Fourteenth Amendment for violations of his substantive right to due process. See Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir. 1999). But whether brought pursuant to the Fourteenth or Eighth Amendment, the analysis is the same. Id. Thus, to keep terminology consistent with applicable decisions, the undersigned will refer to Plaintiff's claim as one brought pursuant to the Eighth Amendment.

First, the alleged deprivation must be "sufficiently serious" under an objective standard. In cases involving a failure to prevent harm, this means that the prisoner must show that the conditions of his incarceration present an objective "substantial risk of serious harm." Second, the prisoner must show that prison officials had subjective knowledge of the risk of harm. In other words, an official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Howard v. Waide, ___ F.3d ___, 2008 WL 2814821, at *7 (10th Cir. July 23, 2008) (quoting Farmer, 511 U.S. 833-37) (internal citations omitted).  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842 (citation omitted).  But the "mere fact that an assault occurs . . . does not establish the requisite indifference to a prisoner's constitutional rights," Hovater v. Robinson, 1 F.3d 1063, 1066 (10th Cir. 1993) (quotation omitted), and "an official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not . . . a constitutional violation." Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008).

To evaluate Defendants' claim to qualified immunity, it is necessary to first consider whether Plaintiff has established the existence of a constitutional violation.  See, e.g., Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1150 (10th Cir. 2006).  With respect to Sheriff Winchester and Defendants Taylor and Dickson, he has.  Plaintiff alleges that he faced a

substantial risk of serious harm to which Defendants were deliberately indifferent, and the evidence, taken in the light most favorable to Plaintiff, shows this to be partially true.

As to the August 7 attack in particular, Plaintiff contends Defendants knew Sevilla posed a substantial risk of physical injury to him, and did nothing to protect him from Sevilla. He argues that the grievance he submitted on July 30 put Defendants on notice that he faced a risk of physical harm. Amended Complaint, p. 3b. Viewing the plain language of this grievance along with the inferences that may be drawn from it in the light most favorable to Plaintiff, this grievance did give its addressees, Sheriff Winchester and Defendant Taylor, sufficient notice that Plaintiff faced a risk of physical harm from Sevilla. The grievance specifically alerted Sheriff Winchester and Defendant Taylor that Sevilla, who was identified by name, was essentially attempting to extort money from Plaintiff by threatening him with the possession of his family members' addresses. See Response, Doc. No. 82. While it appears that Sevilla was primarily seeking money in exchange for the return of the address information, extortion, by its very nature, necessarily involves some threat of physical violence. It is the threat of physical harm that motivates the target of an extortion attempt to perform the desired act. Indeed, as part of the action Plaintiff believed jail officials should take in response to the grievance, Plaintiff asked Taylor and Sheriff Winchester to "prevent [Sevilla] from following through on his threats to me and my family." Id. The grievance apprised Winchester and Taylor of the facts that Sevilla was extorting Plaintiff and that Plaintiff feared for his safety and that of his family members, and he wanted protection from Sevilla. This was enough to put Winchester and Taylor on notice that

17

Plaintiff faced a risk of serious physical injury and that they needed to take action to at least investigate it to determine whether Sevilla posed a threat to the Plaintiff.

Further, the evidence shows that Plaintiff personally reiterated his fears to Defendant Taylor when he briefly spoke with her about the grievance after she had received it. Their conversation focused upon Plaintiff's fear that, whether he paid Sevilla for the address information or not, his safety was at risk because if he did not pay Sevilla, Sevilla would make good on his threat, and if he did pay Sevilla, there was a chance that Sevilla had written the addresses down and would continue to threaten Plaintiff even if Plaintiff did pay him. See Motion, Ex. 1, p. 63.

Despite having knowledge of Sevilla's identity and that he posed a threat to Plaintiff's personal safety, there is no evidence that Defendant Taylor and Sheriff Winchester did anything at all to either investigate Plaintiff's claims or to protect him from Sevilla. In fact, Plaintiff claims that he only had the brief conversation with Defendant Taylor because he stopped her while she was passing by him a few days after he submitted the grievance. See Motion, Ex. 1, p. 63. Plaintiff has shown that he faced an obvious risk of serious physical injury and that Sheriff Winchester and Defendant Taylor did nothing to prevent it. These Defendants have produced no evidence indicating that they investigated Plaintiff's grievance or that for some other reason, they did not believe that Plaintiff faced a risk of physical injury from Sevilla. Thus, Plaintiff has established that Defendant Taylor and Sheriff Winchester were aware of and disregarded a substantial risk to his safety.

In connection with the August 7 attack, Plaintiff also contends that Defendant Dickson failed to protect him from the attack, that Defendants failed to train Defendant Dickson properly, and that Defendant Gabriel failed to properly supervise her staff on the evening of the attack.  Amended Complaint, p. 3b.  To establish a claim for failure to properly train, Plaintiff "must identify a specific deficiency in the county's training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety."  Lopez v. LeMaster, 172 F.3d 756, 760 (10th Cir. 1999).  A failure to supervise claim must be substantiated with proof that "the supervisor's subordinates violated the constitution.  Then, a plaintiff must show an 'affirmative link' between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates."  Serna, 455 F.3d at 1151.  There is no evidence tending to establish any of the foregoing.  As to his failure to properly train claim, Plaintiff has not alleged the existence of any specific deficiency in Defendant Dickson's training, see Amended Complaint, p. 3b, let alone proven that any such deficiency caused Defendant Dickson to be deliberately indifferent to his safety.  Motion, Ex. 1, p. 75.  He has directed the Court's attention to several hundred pages of documents he filed earlier in this litigation in connection with a motion to compel and states he believes these documents, when compared to the conduct displayed by these Defendants, make it obvious they were inadequately trained.  Response, pp. 3-4.  In responding to a motion for summary judgment, Plaintiff has an obligation to direct the court's attention to specific facts within the evidence to support his claim.  See Serna, 455

19

F.3d at 1151.  If Plaintiff cannot be bothered to comb through the materials received in response to his discovery requests and point to obvious, specific facts that support his claim that GCDC employees were inadequately trained, the undersigned will not sift through his discovery and do it for him.

With respect to Plaintiff's claim that Defendant Gabriel failed to properly supervise Defendant Dickson, Plaintiff has not offered anything that indicates that Defendant Gabriel actively participated or acquiesced in any constitutional violation allegedly committed by Defendant Dickson.  Plaintiff has offered absolutely no evidence and no allegations or proof specifying what Defendant Gabriel did or did not do to support Plaintiff's claim of constitutionally inadequate supervision.  Amended Complaint, p. 3a; Motion, Ex. 1, p. 76. In the face of a motion for summary judgment premised upon a claim to qualified immunity, "[t]he plaintiff cannot rest on the pleadings . . . but must set forth specific facts by reference to affidavits, deposition transcripts, or other exhibits to support the claim." Serna, 455 F.3d at 1151. As Plaintiff has failed to do so, with respect to his claims against Defendant Gabriel, she is entitled to summary judgment on the claims relating to the August 7 attack set forth in Count I of the amended complaint.

Insofar as Defendant Dickson is concerned though, Plaintiff has produced undisputed evidence, in the form of sworn allegations in his complaint, showing that Defendant Dickson was working in the control tower in the pod where the attack occurred at the time of the attack, that his cell door was electronically opened, and that Dickson was aware that the attack occurred because he brought Plaintiff a mop and bucket after the attack so that

20

Plaintiff could clean up the mess.  See Amended Complaint, pp. 3a-3b.  Plaintiff makes these assertions in his amended complaint under the penalty of perjury and Defendants have produced nothing to the contrary.  Indeed, they have not addressed Dickson's involvement in the August 7 attack at all.  If the facts are as Plaintiff swears them to be, then Defendant Dickson enabled and allowed the attack to occur.  See id.  There is no indication that jail officials conducted any investigation into the attack at all.  In fact, it was not until Nurse Johnson noticed that Plaintiff had "markings" on his face that anyone inquired as to what happened to him.  Amended Complaint, p. 3b; Motion, Ex. 9.[8]  This was two days after the attack and apparently the first and only time anyone inquired about why Plaintiff had cuts or bruises on his face.  Given the foregoing, Plaintiff has sufficiently established that Defendant Dickson was aware of and disregarded a serious risk to Plaintiff's safety.

Turning to the failure to protect claims set forth in Count II of the amended complaint, which are premised upon the August 19 assault, it is recommended that summary judgment be denied as to Defendants Sheriff Winchester and Taylor.  Plaintiff contends that the grievance he submitted to Sheriff Winchester and Taylor on August 9 after the first attack apprised them that he faced a substantial risk of serious harm.  Amended Complaint, p. 3c.  In that grievance, Plaintiff explained how the assault occurred and accused Defendant Dickson of allowing the attacker into Plaintiff's cell.  Amended Complaint, Doc. 12.

---

[8] Though Exhibit 9 is an unsworn report from Nurse Johnson, it has been considered in connection with this argument because it was submitted by the Defendants and, as to this portion of her statement, Plaintiff appears to agree to its accuracy – his allegations do not differ from her statement.

Viewing the evidence in the light most favorable to Plaintiff, the submission of this grievance in combination with the fact that Plaintiff had actually previously been attacked was sufficient to place Sheriff Winchester and Defendant Taylor on notice that Plaintiff had been assaulted and they have the duty to investigate Plaintiff's claims and take action to protect him from future harm. Defendants contend that because Plaintiff did not specifically identify his attacker by name, it was impossible for them to investigate his claims or take any action to protect him from any potential harm. <u>See</u> Motion, p. 20. From the undersigned's experience in dealing with prisoner lawsuits, it is not uncommon for an inmate to refuse to reveal the name of the prisoner who assaulted him for fear of further assaults or for being labeled a "snitch" with all of its attendant consequences. <u>See, e.g.</u>, <u>Howard</u>, ___ F.3d ___, 2008 WL 2814821, at *13.

Further, given that in the weeks preceding the second attack Plaintiff had submitted a grievance explaining that Sevilla was extorting him and that Plaintiff had been attacked a few days earlier, jail officials should have at least investigated the possibility that Sevilla was the attacker and taken precautions to ensure that Plaintiff was protected from Sevilla. <u>See</u> <u>Howard</u>, ___ F.3d ___, 2008 WL 2814821, at *9 (emphasizing the importance of considering all the circumstances known to prison officials when evaluating the actions taken by prison officials in connection with a failure to protect claim). But there is nothing indicating that this occurred. "Regardless of how prison officials become subjectively aware of a substantial risk of serious harm to an inmate . . . the Eighth Amendment requires them to respond reasonably." <u>Id.</u> at *8.

Additionally, the evidence shows that as of August 16, jail officials gained a greater understanding of the relationship between Plaintiff and Sevilla when Sevilla admitted to Taylor that he was responsible for the attack upon Plaintiff.  Motion, Ex. 11.  Taylor states that Sevilla told her he "smacked" the Plaintiff several times because Plaintiff would not leave Sevilla's cell.  Id.  Sevilla also told her that Plaintiff was seeking his assistance in attempting to escape and he provided some notes to her that Plaintiff had written to Sevilla to back his statements.  Id.  From the materials submitted by the parties, it appears that instead of investigating Sevilla's claims further and trying to obtain an accurate assessment of the extent to which he posed a continuing threat to Plaintiff, if at all, they simply accepted Sevilla's word on its face and concluded that Sevilla was justified in assaulting Plaintiff as Plaintiff would not leave Sevilla's cell.  Accordingly, they took no action to determine if Plaintiff's or Sevilla's version of the attack was correct.  Given the knowledge in possession of Sheriff Winchester and Defendant Taylor at the time of the second attack upon Plaintiff, they should have been aware of a substantial risk to Plaintiff's safety, and they, unreasonably, took no action to protect Plaintiff.

However, Defendants Coleman and Stokes are entitled to qualified immunity on Plaintiff's claims arising from the second attack because Plaintiff has not shown they violated his constitutional rights.  There is no evidence indicating that Defendant Coleman had any awareness of Sevilla's threats and attempts to extort Plaintiff, that Plaintiff had been assaulted on August 7, or that Sevilla was responsible for the prior attack upon Plaintiff.  It is thus impossible to conclude that he was aware that he was placing Plaintiff at risk of an

23

attack by escorting him through the day room and leaving him unattended with other inmates. As to Defendant Stokes, it is clear he acted to protect Plaintiff while in the control tower by summoning assistance once the second attack began.  Amended Complaint, p. 3c.  With respect to Plaintiff's claim that Defendant Stokes was improperly trained, Plaintiff has not identified any specific deficiency in Stokes' training or suggested how the inadequate training caused his alleged injury.  Without any evidence to support these claims, it is appropriate to grant summary judgment at this juncture.  See Serna, 455 F.3d at 1151.

Accordingly, Defendants Coleman and Stokes are entitled to qualified immunity on Plaintiff's claims asserted in Count II of the complaint because it has not been shown that they were deliberately indifferent to a substantial risk that Plaintiff faced serious harm.

As to Sheriff Winchester, Defendant Taylor, and Defendant Dickson though, there is evidence establishing the existence of a constitutional violation.  Further, a prison official's obligation to protect a prisoner's safety and bodily integrity is a clearly established right.  See Berry v. City of Muskogee, 900 F.2d 1489, 1499 (10th Cir. 1990); see also Farmer, 511 U.S. at 832-34.  Accordingly, these Defendants' summary judgment claim to qualified immunity for the events set forth in Counts I and II of Plaintiff's Amended Complaint should be denied.

### B.       Right of Access to the Courts Claims

The Due Process Clause of the Fourteenth Amendment guarantees state prisoners the right to "adequate, effective, and meaningful" access to the courts.  Bounds v. Smith, 430 U.S. 817, 822 (1977).  Pretrial detainees also have a constitutional right of access to the courts.  Love v. Summit County, 776 F.2d 908, 912 (10th Cir. 1985).  "[T]he fundamental

constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds, 430 U.S. at 828 (footnote omitted).  Notwithstanding this right, however, an inmate claiming a violation of his right of access to the courts must demonstrate that he suffered an actual injury. Lewis v. Casey, 518 U.S. 343, 349 (1996).  Thus, to establish a claim for the violation of the right of access to the courts, a prisoner must show that "the denial of legal resources hindered the prisoner's efforts to pursue a nonfrivolous claim." Penrod v. Zavaras, 94 F.3d 1399, 1403 (10th Cir. 1996) (per curiam).  Similarly, a prison official's failure to deliver an inmate's mail may interfere with an inmate's First Amendment right of access to the courts via mail.  See Wardell v. Duncan, 470 F.3d 954, 959 (10th Cir. 2006).  To establish the denial of access to courts via interference with legal mail, a plaintiff "must show that non-delivery of his legal mail resulted in actual injury by frustrating, impeding, or hindering his efforts to pursue a legal claim."  Simkins v. Bruce, 406 F.3d 1239, 1243 (10th Cir. 2005) (quotation and footnote omitted); see also Treff v. Galetka, 74 F.3d 191, 194 (10th Cir. 1996) (establishing a claim for denial of access to courts via interference with mail requires "that any denial or delay of access to the court prejudiced [the prisoner] in pursuing litigation.").

As to Plaintiff's right of access to the courts claims premised upon Defendants' alleged interference with his access to legal research resources and an ink pen, Defendants argue Plaintiff has failed to demonstrate an actual injury occasioned by Defendants' conduct. Motion, pp. 21-22.  To withstand summary judgment, the nonmoving party must establish

the elements essential to his case on which he bears the burden of proof at trial. <u>Celotex</u>, 477

U.S. at 322. "[A] complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> at 323.

The evidence submitted demonstrates Plaintiff suffered no actual injury in connection

with either of his access to the courts claims. Plaintiff's first denial of access claim is

premised upon the lack of legal research materials and pens to assist him with bringing a suit

complaining of the events set forth in Counts I and II of the amended complaint, namely

Defendants' allegedly unconstitutional failure to protect him from two assaults. Amended

Complaint, p. 4a. However, an actual injury showing interference with access to the courts

exists only where an inmate has been frustrated, impeded, or hindered in his efforts to pursue

a non-frivolous legal claim. <u>Lewis</u>, 518 U.S. at 350-51. Indeed, the right of meaningful

access to the courts does not entail an "abstract, freestanding right to a law library or legal

assistance." <u>Id.</u> at 351. Instead, the inmate must "demonstrate that the alleged shortcomings

in the library or legal assistance program hindered his efforts to pursue a legal claim." <u>Id.</u>

This may be accomplished, for example, by showing

> that a complaint he prepared was dismissed for failure to satisfy some
> technical requirement which, because of deficiencies in the prison's legal
> assistance facilities, he could not have known. Or that he had suffered arguably
> actionable harm that he wished to bring before the courts, but was so stymied
> by inadequacies of the law library that he was unable even to file a complaint.

<u>Id.</u> Plaintiff has not established such prejudice. He was able to file a complaint and

commence the instant action despite the denial of access to materials to assist with doing so,

and the action was not dismissed based upon a technicality or some other procedural

requirement about which Plaintiff was unaware. To the contrary, it has proceeded to a merits-based resolution of Plaintiff's claims via motions for summary judgment. Given that Plaintiff is unable to show an actual injury resulting from prison officials' denial of materials Plaintiff claimed to have needed to pursue the instant action and that such an actual injury is an essential element of his claim, Defendants are entitled to summary judgment upon this claim.

Similarly, there is no proof of an actual injury occasioned by Defendants' interference with Plaintiff's legal mail to support Plaintiff's claim that prison officials' inspection of his mail denied him access to the courts. For one, the evidence shows that, with the exception of the NTSB letter, the confiscated mail consisted of photocopies, made and sent by CESB, of letters Plaintiff wrote to his criminal defense attorney. Amended Complaint, Docs. 11, 23-24, 26, 29, 43, 45, 61, 69, 89, 105-106, 113; Motion, Ex. 1, pp. 95-96. There is nothing to indicate, and no allegation, that GCDC staff impeded the original flow of communication directly between Plaintiff and his criminal defense attorney by intercepting correspondence sent directly to or from Plaintiff directly to or from his attorney. Additionally, the mail confiscated around December 20, 2005, and January 3, 2006, was only temporarily seized and eventually was delivered to him, Amended Complaint, p. 4e, Doc. 66, and Plaintiff was able to secure replacement copies of the alleged confiscated documents. Amended Complaint, Docs. 105-106, 113. The delay between when Plaintiff's mail arrived at the GCDC and when it was turned over to him was relatively short, ranging from periods of three to approximately eight days. Amended Complaint, p. 4e, Doc. 66. Accordingly, at most,

27

GCDC's actions delayed Plaintiff's receipt of photocopies of correspondence directly sent to his attorney; but there was no interference with Plaintiff's ability to communicate directly with counsel or the courts.   Indeed, Plaintiff was represented by counsel in the criminal action that was the subject of much of the correspondence between Plaintiff and his attorney which is one means by which an inmate is afforded access to the courts.   See Bounds, 430 U.S. at 831.   Insofar as the NTSB letter is concerned, again, there is no evidence that the delay in receiving the letter, or that it was opened outside Plaintiff's presence, hindered his ability to pursue claims in the action before the NTSB or his pending criminal case.   Thus, there is no evidence that Plaintiff's ability to participate in his pending criminal proceedings, the subject of the temporarily seized mail, was frustrated, hindered, or impeded by GCDC staff's inspection of his legal mail, and no evidence of an actual injury to support Plaintiff's second access to the court claim.

Plaintiff alleges that Defendant Coleman shared with law enforcement officers and the prosecution the legal mail he temporarily seized.   Plaintiff suggests he was actually injured in the presentation of legal arguments at a hearing held in his criminal case because the "prosecutor was completely prepared for each and every point of strategy I had discussed with my defense attorney in one of the letters shared with law enforcement [officers] . . . ." Amended Complaint, p. 4f.   However, there is absolutely no evidence supporting these claims and conclusory allegations of actual injury are insufficient.   See, e.g., Wardell, 470 F.3d at 959.

28

Given that there is no evidence supporting the actual injury element of Plaintiff's right of access to the courts claims, Defendants are all entitled to summary judgment on Plaintiff's claims asserted in Counts III and IV of the Amended Complaint.

### C.      Garfield County and the GCDC's Motions

"A plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation."  Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998 )(citations omitted); see Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) (municipalities can only be held liable under section 1983 for "action pursuant to official municipal policy [or custom which] caused a constitutional tort.").

Plaintiff has not identified any specific municipal policy or custom that he alleges was the moving force behind the constitutional violations he claims, and he has not provided any evidence of any such policy or custom.  Accordingly, Defendant Garfield County's motion for summary judgment should be granted.

Moreover, insofar as the GCDC is concerned, again, Plaintiff has not identified any specific policy or custom of the Garfield County Detention Center Authority that he alleges was the moving force behind the constitutional violations he claims, and he has not provided any evidence of any such policy or custom.  Accordingly, the GCDC's motion for summary judgment should be granted.

Furthermore, it is noted that insofar as Plaintiff hopes to maintain a claim against the GCDC itself (versus the Garfield County Detention Center Authority), a detention center lacks an identity separate and apart from the county it serves and therefore is not a suable entity in a § 1983 action.  See, e.g., Ketchum v. Albuquerque Police Dep't., No. 91-2200, 1992 WL 51481, at *2 (10th Cir. Mar. 12, 1992) (unpublished) (a municipal police department is not a suable entity because it lacks a legal identity apart from the municipality); see also Leterski v. Kingfisher County Jail, No. CIV-06-451-W (W.D. Okla. Apr. 3, 2007) (unpublished) (order granting county jail's motion to dismiss because "it is not a legal entity capable of being sued."); Willson v. Okla. County Detention Ctr., No. CIV-00-491-R (W.D. Okla. Apr. 20, 2000) (unpublished) (order adopting recommendation for dismissal of the Oklahoma County Detention Center as a defendant because it lacks an identity separate from the county itself); Carter v. Okla. County Jail, No. CIV-95-171-C (W.D. Okla. Mar. 28, 1995) (unpublished) (order adopting recommendation for dismissal of a § 1983 claim against a county jail because "it lacks an identity separate and apart from the county itself, which, under proper circumstances, is a suable entity."). Accordingly, the GCDC is entitled to summary judgment on all of Plaintiff's claims against it.

Lastly, Plaintiff contends generally that he has not had sufficient time to conduct discovery.  See Response , pp. 1-2.  It is worth noting that the discovery period in this action was open for nearly ten months and that Plaintiff was granted two generous extensions of time to complete discovery.  See Doc. No. 94.  Furthermore,

[a] party seeking to defer a ruling on summary judgment under Rule 56(f) must file an affidavit that explains why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts. A party may not invoke Rule 56(f) by simply stating that discovery is incomplete but must state with specificity how the additional material will rebut the summary judgment motion.

Libertarian Party of New Mexico v. Herrera, 506 F.3d 1303, 1308-1309 (10th Cir. 2007).

Plaintiff has provided no affidavit pursuant to Rule 56(f) and has not explained what information he believes could be generated if he were given additional time to complete discovery. Though he is proceeding pro se, he is required to comply with the rules of procedure just as any other litigant. See Kay v. Bemis, 500 F.3d 1214, 1218 (10th Cir. 2007). Plaintiff's general allegation that he needs additional time to complete discovery is insufficient to preclude the entry of summary judgment.

## **RECOMMENDATION**

For the aforementioned reasons, the undersigned recommends:

1.   Defendants Randy Coleman, Sheila Gabriel, and Tony Stokes' Motion for Summary Judgment [**Doc. No. 101**] be **GRANTED**;

2.   Defendant Garfield County's Motion for Summary Judgment [**Doc. No. 102**] be **GRANTED**;

3.   Defendant Garfield County Detention Center's Motion for Summary Judgment [**Doc. No. 103**] be **GRANTED**;

4.   Defendants Sheriff Bill Winchester and Misty Taylor's Motion for Summary Judgment [**Doc. No. 101**] be **DENIED** as to Counts I and II but granted as to Counts III and IV;

5.   Defendant Tracy Dickson's Motion for Summary Judgment [**Doc. No. 101**] be **DENIED** as to Count I, the only count he is named in.

For the previously explained reasons, Defendants' Motion to Strike Plaintiff's Untimely Pleadings [Doc. No. 124] is **DENIED**. Further, Defendants' request for additional time to submit reply briefing is **DENIED**. Under the Local Rules of this Court, leave to file a reply brief is not required and the parties are given eleven days from the date the response was filed to file a reply. LCvR7.1(i). Defendants submitted no reply briefing within this time frame, even though there was no impediment to doing so.

The parties are advised of their right to file an objection to this Report and Recommendation with the Clerk of this Court by September 16th, 2008, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1. The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal questions contained herein. Moore v. United States, 950 F.2d 656 (10th Cir. 1991). This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

**ENTERED this 27th day of August, 2008.**

DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE